Good morning, your honors. My name is Les Marston. I'm here representing the Arviso plaintiffs' appellants. It's our position that the district court committed both an error of law and committed three errors, specifically that the court misconstrued the stipulated judgment, specifically the language referring to the 1989 protests. The court also violated federal law in holding that the enrollment committee did not have a right to appeal the BIA's determination enrolling the 10 individuals, and third, that the district court violated the provisions of Rule 19 in failing after determining that the tribe was a necessary party and could not be joined, considering the second factor of the balancing test under Rule 19, which was to shape the relief, to amend the judgment, to afford the parties to the litigation the relief they were requesting, but yet minimizing the prejudice to the tribe. I'll now address each of those issues. First, the 1989 protests. It was not the intent of the federal government and my clients in entering into the stipulation to violate either the tribe's constitution or enrollment ordinance. In fact, that's exactly why we brought the litigation. We used the term 1989. You're dropping a word at the end of a sentence. I do that sometimes. Sometimes the important word is at the end of a sentence. There's no charge for that advice. Thank you. Thank you, Your Honor. The stipulation talks in terms of a 1989 protest, but in fact, that what the parties to the stipulation intended was that the June 26, 1989 letter, which the 1989 protest language in the stipulation refers to, was a final determination by the Enrollment Committee that these individuals did not meet the one-eighth blood quantum requirement necessary to be members of the tribe. So it was the intent of the parties to roll back the clock, to basically vacate the decisions of the two assistant secretaries, the two conflicting decisions of the assistant secretaries, reinstate the Enrollment Committee's decision, and give the persons that were affected a right to appeal. That's consistent with the enrollment ordinance. The district court, unfortunately, misconstrued that language and thought that what the parties to the stipulation intended was to give the Enrollment Committee a right of appeal, and therefore, the district court thought that what the parties were trying to do was confer onto the federal defendants authority that they didn't have under the enrollment ordinance. That is, the authority to make the decision in the first instance rather than the Enrollment Committee. That was not the intent of the parties, and if the district court had simply held a hearing or let the parties know that the district court was interpreting the judgment that way, we could have clarified that for the district court. But even if you assume, for argument's sake, that the district court was correct, that the interpreting the judgment is giving the Enrollment Committee the right to appeal, the Enrollment Committee has that right under federal law, and the district court committed an error of law in determining otherwise. What the district court did was, it looked at Part 62, which clearly gives an Enrollment Committee the right to appeal from a decision of the Bureau of Indian Affairs regarding eligibility for enrollment. The district court grabbed onto the language in Part 2 that says that a tribal committee may file an appeal as provided for in Section 6.11 of this chapter. But when you go to Section 6.11, what it says is that Part 62 will not apply in those enrollment determinations where the tribal role is prepared and maintained by the tribe. And the district court said, well, here the tribe maintains and prepares the role, therefore Part 62 doesn't apply, therefore the Enrollment Committee doesn't have a right to appeal. But that's not supported by the record. If you look at the record, the tribe doesn't prepare and maintain the role. The tribe and the United States government prepares and maintains the role. I don't understand what you mean by appeal. Appeal to whom? There was an initial decision by the Enrollment Committee to enroll these ten individuals. That decision was sustained or upheld by the Bureau of Indian Affairs. A newly elected Enrollment Committee comes in and it says, wait a second, there was an error. These people were not properly enrolled and made a determination, that's our position, made a determination in the June 26, 1989 letter that these people didn't meet the eligibility criteria. The Bureau of Indian Affairs treated that determination as an appeal from the Bureau of Indian Affairs determination to enroll those individuals. That's what the Bureau did, but it's our position that there was no appeal, that there was a final determination and that all the Bureau of Indian Affairs did was give notice to the appellant sustaining that decision and those applicants who were affected by this decision then took an appeal to the regional director. So the district court violated federal law. I just guess I don't understand how the federal court gets into it in the first place. The federal court gets into it because the Bureau of Indian Affairs, the Secretary of the Interior, pursuant to the authority granted to the Secretary under 25 U.S.C. Sections 2 and 9, prepared the initial role for the tribe and enacted regulations, 25 CFR Part 74. Those regulations were then incorporated into the tribe's enrollment ordinance and the tribe adopted a constitution that specifically gave an applicant who was denied membership in the tribe the right to appeal to federal officials, not to a tribal court, but to federal officials. Part 74. No, it's also the tribe's constitution and the tribe's enrollment ordinance. The Secretary of the Interior, pursuant to Sections 2 and 4, approved that constitution and approved that enrollment ordinance. So the Secretary agreed to be bound by the terms of that constitution and that enrollment ordinance that specifically gives an applicant a right to appeal. Then the Secretary turns around and promulgates regulations, Part 61 and Part 62 and Part 2, all in Title 25 of the Code of Federal Regulations, governing how, once that appeal  was made, there was an appeal taken. That appeal was by the applicants, from the Enrollment Committee's decision, denying them enrollment. It went up to the Regional Director. It was sustained by the Regional Director. It went to the Assistant Secretary for Indian Affairs, Kevin Gover. He then doesn't rule on the merits of the appeal, as he's required to do, under his own regulations and under the constitution and under the enrollment ordinance. He then says, I'm not going to do anything. And I'm going to order the BIA to cease and desist and not do anything, which they're obligated to do under the tribe's constitution and enrollment ordinance. But that still doesn't get the federal courts into it. It's like a delegation of authority and sovereign responsibility to the Bureau of Indian Affairs. But how does that get the courts, still get the courts into it? Because we have the right under the APA to review agency action unreasonably delayed or denied. And the federal agency here had a responsibility to act. And if we plead a case under the APA, then the court, by its very nature, under California v. Sanders, has 1331 jurisdiction. Except this is different. We? Who is we? We are my clients. They are our VSO appellants. Except this deals with who gets to determine who our members are and who are not members in a tribe. But you're absolutely right. This case is fundamentally different from any other membership case. And the reason is, in every other membership case, the tribe retains the ultimate authority to make the decision as to who is and who is not a member of the tribe. This tribe made a sovereign decision. And that decision was, we're not going to retain that right to ultimately decide who meets our eligibility criteria. We're going to give that right to the United States government. We're going to give that right to the Secretary of the Interior. Secretary of Interior speaks and says, okay, here is a list of people who are members of your tribe, according to these procedures that you agreed to in your Constitution and the Code of Federal Regulations. Is the tribe bound to accept that? Or can the tribe say, fine, we heard you, but we're not buying that? I'm going to answer that question, but let me answer it kind of in a circular way, okay? And that is, this tribe, a long time ago, decided, when it adopted its Constitution and Enrollment Ordinance, that it wanted to have certain procedural safeguards in place. It wanted, it actually wanted to prevent what's happening in this case. It wanted to make sure that there was an independent, neutral body who ultimately made the determination as to whether or not the initial decision made by the Enrollment Committee was correct, whether the initial decision by the Enrollment Committee complied with the Constitution and Enrollment Ordinance. And the person that the tribe vested with that authority was initially the Regional Director and ultimately the Assistant Secretary for Human Affairs. There, keep going. So, so, so, the, the tribe decided that the ultimate decision would be made by the Assistant Secretary for Indian Affairs if an appeal was taken, and that decision would be reviewable by a federal district court under the APA. The tribe decided that? Yes, because the tribe specifically put into their Constitution. That's in there, that it would be reviewable. That's correct. Right in the Constitution, it says that if anybody is denied membership in the tribe, they have a right to appeal to, to the, to the Area Director of the Bureau of Indian Affairs. That's what, yeah, but suppose that they said, and so that, that, so, so you're arguing that that gives, what, jurisdiction to the federal court? Absolutely under the APA. To sue the, the, the director. If the, if it gives a right to the applicants who, who are making applications. The Constitution doesn't say that specifically. No, but what it. I just asked you a minute ago, and you said yes. Well, what, what do you mean specifically? It does specifically. I just asked you, and you said yes. Yes, it does. Yes, the Constitution gives the people a right to appeal to federal officials. Yes, but it does not then create, say that, that if, if you're unhappy with the federal official, you can sue in federal court. You're saying, well, that's under the APA, because they, they, they, they goofed when they, their mistake was to, was to, was to, to delegate it to a, to a federal official, if they delegated it to Joe Blow. Well, but, but if we, if we can't, if we can't review, if, if, if either the tribe or the enrollment committee or the applicant can't seek review of the secretary's decision, then, then what happens when the secretary clearly makes an error? Where's the remedy? It's the condition of the tribe. It's the condition of sovereignty of the tribe. That's the problem. You're dealing with a sovereign. A sovereign, a sovereign, a sovereign. But that's. It doesn't say that any final orders that come out of this are, fall under all the regular procedures of the APA and are reviewable in federal court. Well. Santa Clara Pueblo keeps coming back and ringing in my ears. Santa Clara Pueblo. Whoever shifts is different. It's like death is different. Why doesn't Santa Clara Pueblo? Because in Santa Clara Pueblo, the individual brought an action to hold that a provision of the tribe's enrollment ordinance violated the Indian Civil Rights Act, violated the equal protection clause of the Indian Civil Rights Act. The tribe in Santa Clara Pueblo, the tribe's enrollment ordinance vested in tribal officials the authority to ultimately make the decision. That's true here too. No, it is not. No, they, they, they've made a decision to, to, to permit something else. No. Don't they have the right to. What gives the right of appeal to the secretary? Once the enrollment committee makes a decision, an applicant under tribal law and our position is or the enrollment committee under federal law has a right to appeal that decision to first the regional, regional director. And then if they're dissatisfied with his opinion, could the assistant secretary. Isn't that all established by the, by the tribal law and constitution? And by part 62 of the secretary's regulations governing how that appeal process will be governed. After the secretary was delegated the power, wasn't it? Well, the, the yes and no, because originally the constitution and the enrollment ordinance, the, the enrollment ordinance specifically states that the enrollment ordinance is being enacted to supplement the federal regulations. The enrollment ordinance specifically incorporates the federal regulations into the enrollment ordinance. The tribe clearly intended that the secretary would ultimately make the decision of who or who. That was a tribal decision, wasn't it? That the secretary. No. It's, it's, it's, it's a decision of two sovereigns, the, the, the tribe and the United States government. Because the secretary wasn't obligated to be bound by that constitution or enrollment ordinance. And if the tribe, and if somebody doesn't like the ultimate decision, they get to attack the whole thing in the federal court. Well, it doesn't say that in the constitution or enrollment ordinance, but by, but by its very nature, if a, if a federal official is taking action. That's where you're running the Santa Clara problem. Well, doesn't the tribe have to be a party to that? No. An indispensable party? Yeah, isn't that what the district, isn't that what the district court? That's why we're here. The district court determined that the, that the tribe was a necessary and indispensable party to it. And you don't believe the tribe is an indispensable and necessary party in a, in a, in an action designed to determine who belongs to the tribe and who doesn't? No, because, because for two reasons, number one, first of all, the tribes already has established the criteria for membership. The tribe has. That's just where your entire argument falls apart when you say we get into the APA and we get to come into court and we get to leave the tribe in the parking lot. The tribe only has an, the tribe doesn't have an interest in making sure that Jane Doe is enrolled in the tribe. The tribe only has an interest of, of ensuring that if Jane Doe meets the criteria for membership, she's enrolled in the tribe. In essence, the tribe's interest is an interest of ensuring that its laws, its enrollment ordinance is complied with. That's exactly what my clients brought suit for. The enrollment ordinance is being violated by the federal government. And we brought suit to compel the federal officials to do what they're required to  Well, you've got to allow the tribe to stand up in court and be heard and, and tell us what the tribe thinks about all of this. We've left them long behind. Well, we, we haven't left them long behind. Sure you have. You're telling us that they, they have no part in this. Well, only if their interests are being impaired and their interests are not being impaired because their interest is only to ensure that their tribal law and constitution is being followed. And that's exactly why we brought the lawsuit because the federal officials, not the tribe, the federal officials were violating the tribe's enrollment ordinance. We brought suit to get a federal district court order compelling the federal officials to do what they're required to do in the tribal law. Federal officials are involved in their enrollment ordinance? Yes. I mean, all you have to do is read the constitution and the enrollment ordinance. It's, it's, it's clear from the record that their federal officials are involved all over here. The federal officials, they, when the tribe makes an initial preliminary decision under the enrollment ordinance, they send that to the superintendent of the central California agency of the Bureau of the Bureau of Indian Affairs or the Southern California agency. I think we're, we're, we're, we're, we're repeating ourselves. You have about three minutes left if you'd like to. Well, I'll reserve that time for rebuttal. Good morning, your honors. My name is Tamara Rountree and I will rep, I represent the federal appellees. I will be dividing my time with counsel for the tribe. Are you intending to divide it evenly? Yes, your honor. I think it's, what I will first address is, is the threshold issue here of standing. And I think it's important first to, I'm going to focus on one factor of standing, one of the three, and that being causation. Perhaps it's important first to acknowledge here what it is that we understand, the government understands the, our visa appellants to be challenging. And that is the decision of the Department of the Interior that was rendered on January 3rd of 2001 that's found at the excerpts of record page 104. In, in that decision, if, and I invite the court to look at it, but the conclusory sentence is that the BIA was directed to, quote, cease administrative proceedings regarding consideration of blood degree or membership matters pertaining to the lineal descendants of Jose Maria Clack. Now in order to understand what that actually means, I think it might be important for the court to look at what it was that BIA had been, had determined considering the lineal descendants of Mr. Clack, and therefore perhaps what administrative proceedings were affected by this ultimate decision that was rendered on 2001. I'll just run down the pages so that perhaps the court can look later, but those are found at pages 90, 91, 94, 96, 101, 211, and 104. The sequence I've just given you represents the chronological sequence of events. What we start with on page 90, the first was the January, the July 1991 decision that was rendered by BIA, by the Department of the Interior, not BIA, it was by the Secretary. It was delivered to the band, it was a decision that was given to the band, and it concluded that the ten individuals, the first ones who sought membership in the band, who were lineal descendants of Mr. Clack, it was a determination that those individuals were not eligible for membership, that they didn't meet the blood requirement. We jump then to April 2000, which is the next correspondence forwarded by the Interior Department. How did they get into this blood requirement business? I'm sorry? How did they get into this blood requirement business? And they being, how did they, you mean the federal government? Why is that, you know, I mean, one-eighth, one-sixteenth, one-quarter? Are you saying? Where did all that come up from? That is, that is, under tribal law, there's a requirement of certain blood requirement before one can become a member of the tribe. And so when one seeks to become a member and submits an application, which the ten individuals did back in 1987, this is how this all began, ten individuals who were lineal descendants of Mr. Clack sought membership. They submitted an application, and what had to be determined by the Enrollment Committee and by BIA by reviewing their records is whether the criteria for membership had been met, one of which is blood degree. If we look, though, at page 91 of the April 2000 letter from Interior to the band. That sounds like what the Nazis did, huh? Well, Your Honor, I do not, I will not comment on this. No, this is fairly standard, so I think. Indeed. But in the Maybe there's something wrong with it. Maybe they ought to do it by DNA and markers, huh? Perhaps, Your Honor. But if we look at the April 2000 letter that's at page 91 of the excerpts, Interior confirms the decision that had been rendered by the Interior Department back in 1991 and indicates that that was the final decision by the Department on the issue of eligibility for those ten individuals who were lineal descendants of Mr. Clack. Now the Department also apologizes for a delay of several years, but indicates that it was still the responsibility of the Department to follow through with the directive that followed from that decision indicating that these folks were not eligible. And that was to correct the blood degree of the individuals who were enrolled in the tribe and who were descendants of Clack. So because a decision had been rendered concerning their blood degree requirement, their being the lineal descendants of Clack, the Department was saying we now have to look at those enrolled members to say if they had been affected by this determination. Twenty-four days later, as shown on the excerpts of record, page 94, Interior wrote to Mr. Currier in his personal capacity. Mr. Currier was a tribal member. He is now the chairman of the band, but this letter was written to him in his personal capacity indicating... I know you're talking about causation, but I have no idea where you're going with this. I'm sorry. What I'm trying to establish is the sequence of events that had happened and which will lead up ultimately to the 2001 letter that was written by the Department and the Interior. Is there a way you can summarize this? Well, ultimately... You're getting so attenuated. Certainly. Certainly. What was decided by the Interior Department is that these lineal descendants were not eligible for membership. And those lineal descendants who were affected by that decision filed an appeal with the Interior Department. They filed the appeal in May of 2000, and that's found on page 96, and indicated essentially we, the lineal descendants of Jose Maria Collac, disagree with your decision, Interior Department, that we are not eligible for membership. That was the decision that was pending at the time the 2001 letter was written that the Arvizo appellants have challenged in this litigation. So the 2001 letter that says administrative proceedings shall cease essentially terminated that appeal process by the lineal descendants of Jose Maria Collac. What's at stake here? Is there a casino here? Perhaps. But I just need to make this... I need to make the point. Why don't you speak up? Tell us what's at stake so we don't... I'm not the appellant, so you can ask them. But the question... You don't know? I'm not the appellant, so I can't address that. But I just would like me to make... I thought you represented the government. I do. I didn't bring this. The government did not bring this case. We don't know what the bottom line concern is. I'm sorry? The government doesn't know what's going on? The appellants have claimed that their injuries are several, and perhaps one of which is related to casinos. But the point I'm trying to make is this Court needs to determine what it was in the 2001 letter that caused the injuries that these appellants have complained of. Reservation in the Southern District of California? The Rincon Band? I'm sorry, I do not know that. But simply what I... You don't know? No, I don't know if there's a reservation, if they have a particular reservation. But I'm simply trying to explain to the Court that we feel that the factor of causation has not been established. We don't know what it is that was found in the 2001 letter that caused the injuries that these appellants have complained of. We got it. Okay, and... I understand the government's position. I think we'd like to hear from the Band. Okay. If I just may address one issue of... I will not. That's quite all right. No, that's fine. Thank you. Good morning. My name is John Fredericks. I represent the Rincon San Ysidro Band of Mission Indians. Our position in this case, Your Honor, is that this case does not belong here because it's purely a question of tribal enrollment. Well, can you tell us what's going on? What's going on here? Why is there a dispute over whether they should be enrolled or not? This is a dispute among tribal members, and they do have a reservation in Southern California, and they do have a casino. Yeah, it's down in the desert, isn't it? It's just in East San Diego County, Your Honor. East San Diego County. Well, that's a desert, isn't it? Well, I've been there, and... Near Yuma? It's near Escondido. Escondido, okay. This case is about an enrollment dispute. In the desert, okay. It's about an enrollment dispute among tribal members. But they do have a casino. Yes, they do, Your Honor. They're making money. The casino is making money. That's my understanding. Yes. All right. They didn't have a casino back when this dispute started. Yeah. But the case was filed by a group of tribal members against the federal government. They didn't join the tribe, who was, as the district court properly found, an indispensable party. And I thank the district court for not leaving the tribe in the parking lot. I think it's clear, first of all... If I recall, it was, yes. Well, when was this tribe recognized? This tribe was recognized prior to 1960. They organized themselves in 1960 under what I call a constitution. The document is called its Articles of Association. That's the governing document, the internal governing document of the tribe. And that's the document that establishes its base membership and then, following that, its enrollment procedures. What's the size of the reservation? It's a small reservation. I can't tell you off the top of my head how many acres there are in the reservation. But it consists of trust land. And it also has allotted lands and fee land checkerboarded within its original boundaries. Well, I mean, is it 10 acres, 20? It's larger than 100 acres, Your Honor. More than 100? People living on it? Yes. Both tribal members and non-members. And who? Non-tribal members. There are non-Indians that live within the boundaries of the reservation. This is one of the reservations that was allotted. Allotted pursuant to? Pursuant to a federal statute. I don't recall off the top of my head what the statute was, but it was an allotted reservation. Members of the tribe received allotments. Some of those allotments went into fee as a result of the provisions of the old General Allotment Act. Is there a residence requirement? A residence requirement to vote or for membership? Well, to vote. Do you have to live on the reservation for any purpose? I'm not sure. I don't recall. People are going like this in the back of the room. They would know better than I would, Your Honor. The question here really is whether this court, the initial question that the court should address is whether it has jurisdiction. I think it's clear that the court does not have jurisdiction. This case presents a dispute that arises under tribal law. It doesn't arise under federal law. But the other side says it's different because your tribe agreed to have these matters determined ultimately by the federal government. Therefore, the APA attaches. You can haul all of this into federal court. And we disagree with that, Your Honor. We disagree for two reasons. One, the tribal law does give the Bureau of Indian Affairs a limited role in basically providing technical assistance to the Enrollment Committee when they initially decide whether an applicant should be enrolled or not. And two, hearing appeals by persons that are either denied or deprived of membership by the Enrollment Committee. For one thing, this case wasn't presented that way. We don't have plaintiffs in this case who were denied or deprived of membership by the Enrollment Committee. And that's what screwed this whole case up from the very beginning. Secondly, the fact that the BIA can hear appeals under tribal law does not confer jurisdiction on this court. You're saying that none of the plaintiffs were denied membership by the Enrollment Committee? None of the plaintiffs in this case, Your Honor. The plaintiffs in this case are not the ten individuals whose applications were being processed by the Enrollment Committee. And that's one of the major problems with this whole case. The plaintiffs are trying to choke people. That's part of the standing causation. Yes, it is. But getting back to the issue of jurisdiction, which I think is an important issue here, because we have a whole line of cases, and they culminate with Santa Clara, that says that a tribe's right to determine and define its own membership is an exclusive and important part of its internal sovereignty, one which federal courts will not involve themselves in. That's what this case is all about. The fact that the Bureau of Indian Affairs has authority under tribal law to hear appeals, assuming that they're properly brought in the first place, and in this case, there was no appeal properly brought, but just because the Bureau of Indian Affairs can hear an appeal of a denied member's enrollment application doesn't give federal courts jurisdiction because there's no federal question. The federal official here is interpreting tribal law. And the tribal law provides, in the end, that the federal... So you're saying the tribe is a necessary and indispensable part? Most definitely the tribe is indispensable to this case, Your Honor, yes. That's apart from the issue of jurisdiction. And that's really technically the only issue that's here? Well, the court can always revisit the issue of subject matter jurisdiction, and they argue that the court... I'm sorry, that it was the district court held that there was a... The district court held that the tribe was an indispensable party, and that was the ground that it dismissed the case on. The only other point that I want to make is that under tribal law, when an appeal is properly perfected to a federal official, the ultimate federal official's decision, again, under tribal law, is, quote, final and conclusive. And so tribal law in this case itself precludes any further review. It gives the Secretary of the Interior final decision-making authority in cases where there is an appeal that's properly perfected. So to sum up, Your Honor, it's our position that the federal courts lack subject matter jurisdiction over this case, and in any event, the district court properly ruled that the tribe was an indispensable party and properly dismissed the case. Thank you. I'll be brief. I have three points. First of all, my client... How about the point that the ten individuals were never denied enrollment by the... That's absolutely correct, but our rights are being impaired, which is my first point. There's individuals who are not eligible for membership that are being considered members of the tribe. They're running for office, they're voting in tribal elections, they're receiving per capita payments from the casino, and they're participating in tribal programs. To that extent, they're diminishing my client's vote, my client's economic interest in receiving their fair share of the per capita distribution, and my client's right to fairly and equally participate with other members of the tribe in tribal programs. We're directly affected by the Secretary's decision. We're all directly affected by governmental decisions, but that doesn't necessarily give us all a right to challenge them, or indirectly or... Well... Let me ask you this. Is it correct that the reason that the Secretary is... Your jurisdictional book here is the Secretary, I take it. Is it true that that's a product of tribal law, that the appeals go to the Secretary? It's our position that it is a product of both tribal and federal law, because, again, the tribal ordinance incorporated the federal regulations. The Secretary promulgated regulations to govern how his appeals through... acquired by tribal law are processed, and therefore the Secretary fails to comply with the federal regulations in processing the appeal, and fails to comply with the tribal enrollment ordinance that he specifically approved and agreed to be bound by, that that is agency action that's reviewable under the APA, and therefore the court has jurisdiction under 1331. And on the indispensable party issue? Well... Very quickly? Just quickly. One point I want to make is the court violated Rule 19. As you know, once the court makes a determination that the party is necessary and that the tribe's necessary and cannot be joined because of sovereign immunity, the court's supposed to go through a balancing test. One of the factors, the second factor, is that the court is supposed to see if the judgment could be shaped or modified to remove the prejudice to the tribe but still afford relief to the parties to the lawsuit. The court just assumed that my clients and the federal government wanted to violate the enrollment ordinance by conferring onto the federal official authority that the federal official didn't have under the enrollment ordinance, which was to make the initial determination as to whether these individuals were eligible for enrollment. The judge never asked the parties who negotiated the stipulation what their intent was when they used the phrase, you know, reinstate the 1989 protests. If the court had done that, we would have told the court that the 1989 protests, when we used that language, what we were inferring was the original June 26, 1989, decision that was made by the Enrollment Committee and sustained by the Bureau of Indian Affairs. Did you ask for reconsideration? No, we did not. Okay. You have more than is your time. Thank you. Thank you. Okay. Before hearing the next cases, the court will take a five-minute recess. Are you going to submit that case? Yes. The case just argued is submitted. All rise.
judges: Schroeder, Pregerson, Trott